JOHN EDMUND BURKE v. JENNIE FINE, GENERAL ADMINISTRATRIX, SUBSTITUTED FOR JACOB FINE, DECEASED, AND OTHERS.[1]

February 15, 1952.

No. 35,504.

*Benedict S. Deinard* and *Leonard, Street & Deinard,* for appellants.

*Clifford W. Gardner,* for respondent.

[1] Reported in 51 N. W. (2d) 818.

FRANK T. GALLAGHER, JUSTICE.

This was a suit commenced in August 1945 for the specific performance of an alleged oral contract to convey a vacant lot to plaintiff. Plaintiff joined as defendants the four co-owners of the lot and certain state officials. Before trial, the court dismissed the action as against the state officials.

The oral contract was allegedly entered into about April 3, 1943, during a conversation between plaintiff, an attorney, and Jacob Fine, who owned the lot with his three brothers, the defendants Adolph S. Fine, Benjamin Fine, and Max Fine, as tenants in common. After the action had been commenced, but before it was brought on for trial, Jacob Fine died, and his wife, as administratrix of his estate, was substituted. At the trial in June 1947, two friends of plaintiff, Francis McGrath and John Duell, testified about the details of the conversation which had occurred four years earlier. Plaintiff claimed that Adolph, Benjamin, and Max Fine were bound by the alleged contract on the theory that the four brothers were partners and that Jacob was authorized to contract to sell the whole lot. Plaintiff also claimed that the contract was taken out of the statute of frauds by virtue of his having taken possession of the lot under the contract and having made certain valuable improvements. No payment was ever made, but at the commencement of this action plaintiff paid into court $1,477.98, representing the alleged contract price.

The trial court found, among other things, that defendants had agreed among themselves to act as copartners and joint adventurers with respect to the purchase, management, use, and sale of various parcels of land, among which is the lot here in dispute; that plaintiff knew that defendants professed to be engaged as copartners and joint adventurers with respect to the lot; that on or about April 3, 1943, Jacob Fine, acting for himself and as agent for the other defendants, entered into an oral agreement by which defendants sold, transferred, and delivered to plaintiff all the equitable title to, interest in, and possession of the lot; and that plaintiff took possession thereof in reliance upon the oral contract and made

permanent and valuable improvements. The court concluded that plaintiff was entitled to have a decree ordering the right, title, and interest of defendants transferred to plaintiff. Defendants' motion for amended findings of fact and conclusions of law or, in the alternative, for a new trial was denied. Defendants appeal from the judgment.

Defendants contend that the evidence does not sustain the finding that an oral agreement was made or the finding that Jacob Fine was authorized to contract for the sale of the entire lot. Defendants also raise several other issues. We find it unnecessary to decide these questions, since it is our opinion that defendants are correct in their contention that plaintiff has failed to show part performance sufficient to take the contract out of the statute of frauds.

The property involved (lot 6 of block 12, Lane's Highland Park, an addition to the city of St. Paul) fronts on the south side of Ford Parkway at Prior avenue and lies directly to the rear of plaintiff's home. Before 1943, the south end of the lot was part of a high hill, and other parts of the lot were as much as 15 feet below the grade of Ford Parkway. It was described as more or less like a jungle and was covered with underbrush and debris. The only trees on the lot were crooked box elders. Plaintiff went onto lot 6 at times when playing horseshoes on his lot, immediately adjacent to lot 6. He went onto the west part of lot 6 at different occasions during the period from 1940 to 1942 in taking a short cut through the lot. According to plaintiff's testimony, rats had come out of the dump on lot 6, and in April 1943 he was trying to burn them out.

In the spring of 1943, plaintiff and Duell, who had had some association with him for years and often visited at his home, spent week ends and holidays working in plaintiff's yard. On April 3, 1943, while they were working on lot 6, Jacob Fine appeared, at which time plaintiff claims that the alleged contract was formed. Subsequent to this meeting, plaintiff hired a bulldozer to rough-grade lot 6, had it leveled, planted a lawn and hedge along the

north and west sides, and planted some trees, bushes, and plants on the lot. In addition to the labor furnished by plaintiff and Duell, the cost of these improvements was $407. Plaintiff contends that when all the elements are considered, including his and Duell's labor, the cost of a tool shed, and the value of 570 square feet which were added to the south end of lot 6 through the vacation of the alley, all of which was paid for by plaintiff, the total value of the improvements exceeds the $1,193.40 alleged in the complaint.

The doctrine of part performance as it has been developed by the courts is essentially a compromise between the policy of the statute of frauds and the need presented by some cases for at least some flexibility in applying it. Handler, Cases and Materials on the Law of Vendor and Purchaser, pp. 66-67. Application of the doctrine in some cases has been explained by the extreme hardship which would result if the statute were applied (Brown v. Hoag, 35 Minn. 373, 29 N. W. 135; Slingerland v. Slingerland, 39 Minn. 197, 39 N. W. 146) ; while in others the court has felt that the policy behind the statute was adequately protected if acts of performance unequivocally referable to the contract were shown (Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N. W. [2d] 362, 166 A. L. R. 435). Of course, many cases present both possibilities. The attitude toward the doctrine of part performance varies in the different jurisdictions; but in Minnesota, since the Shaughnessy case, specific performance of an oral contract may rest on either the so-called fraud theory or the unequivocal reference theory. Ehmke v. Hill, 236 Minn. 60, 51 N. W. (2d) 811. Thus, where plaintiff shows that his acts of part performance in reliance upon the contract have so altered his position that he will incur unjust and irreparable injury in the event that defendant is permitted to rely on the statute of frauds, equity requires that the contract be specifically enforced. Brown v. Hoag, 35 Minn. 373, 29 N. W. 135, *supra.* Or where the relationship of the parties, as shown by their acts rather than by the alleged contract, cannot reasonably be explained except by reference to some contract between them, the oral contract is taken out of the statute of frauds and may be specifically en-

forced. Shaughnessy v. Eidsmo, *supra*. It is our opinion that plaintiff here has failed to show part performance sufficient to satisfy either of these theories.

The behavior of the parties in this case cannot be said to be unequivocally referable to a contract relationship between them. In testifying to his work on lot 6 even before the date of the alleged contract, plaintiff supplies another equally reasonable explanation for his activity. It is reasonable to believe that he was interested in the improvement of lot 6 because of its location immediately adjacent to the rear of his home. The improvements relied on have provided plaintiff with a spacious and attractive back yard, which he and his family have used since 1943. At the time the improvements were undertaken, there was a war-imposed restriction on building activities, so plaintiff easily may have contemplated that the lot would remain vacant for a period long enough to make his expenditures and labor worth while in terms of the use he would get from the lot. Plaintiff's interest in making improvements on land adjacent to his home, even though he had no contract right in the land on which they were made, is further shown by his laying a driveway and planting a hedge within the limits of Prior avenue, at this point unopened by the city. Nor does the record disclose any acts of defendants which point unequivocally to a contract relationship between the parties. Defendants did not vacate the premises or perform any other act to give possession to plaintiff. See, Mason v. Albert, 243 Mass. 433, 137 N. E. 661. It is true that such acts are not likely to occur when the land in question is merely a vacant lot, but that merely adds to the difficulty of proving the case for part performance and certainly does not eliminate the necessity of bringing the case within the confines of the doctrine.

Under the record in the instant case, it cannot be said that defendants' failure to object to the making of improvements unequivocally refers to a contract. Although defendants deny that they were aware of the improvements being made until shortly before this suit was brought, the trial court found that the improvements

were open and visible and were observed by defendants during the period between April 3, 1943, and the commencement of this action. This finding is based on evidence that the homes of defendants were so situated that in traveling to and from their homes and places of business or work it was customary and almost necessary for defendants to travel on Ford Parkway immediately alongside the property. Under some circumstances, it is perhaps possible that a failure of the owner to act could only be reasonably explained by the existence of a contract relationship. But, if there is no showing that the owner knew that the possessor was claiming under a contract, the failure of an owner to object to someone improving his property does not unequivocally refer to an understanding between the parties. The owner of a vacant lot may have no immediate objection to such improvement or use. Plaintiff does not claim that he informed defendants of an intention to go ahead and make changes in the lot under a contract and that he received no objection. We need not decide what effect a failure to object to the making of improvements would have where the evidence is clear or undisputed that defendants knew of the improvements and that they were being made under a claimed contract right. Defendants continually denied that any contract was formed; and, to be of any avail to show an act unequivocally referable to a contract without relying on the contract, plaintiff would have to show that defendants were aware of the contract claim other than from its formation. Although the court found that defendants observed the improvements during the period between April 3, 1943, and the commencement of the suit in August 1945, it is not possible to determine just when defendants observed them and in what stage they were at the time observed. Further, the record presents no clear picture of when it was brought home to defendants that plaintiff claimed to be a contract vendee. Daniel J. O'Connell, employed in plaintiff's office, testified that sometime in the late summer of 1944 he talked with Jacob Fine in Abraham Levin's law office in connection with the lot. Even this testimony does not make it clear that defendants were aware that plaintiff considered

himself to be a contract vendee. On the other hand, the testimony of Levin would indicate that he at no time considered the purported transaction as anything but in the negotiation stage. He testified, for example, that plaintiff had suggested an offer to trade certain lots for the one in question, which Levin said he knew defendants would not consider. Under these circumstances, we cannot say that the relation between the parties, as established by their actions, is unequivocally referable to a contract between them.

Aside from the unequivocal reference theory, plaintiff does not present equities sufficient to take the contract out of the statute of frauds. He shows no affirmative act of defendants which induced him to make the improvements. There is nothing in the terms of the contract, as established by the testimony of plaintiff's witnesses, McGrath and Duell, authorizing plaintiff to take possession. That plaintiff was induced to make the improvements by defendants' failure to object is doubtful. Defendants could not have been expected to object before learning of the improvements, but the only way plaintiff shows that they could know was their opportunity to observe. Furthermore, there is no way to tell how far plaintiff had progressed with his improvement project when defendants did learn of it. Rather than being induced by defendants to make the improvements, it appears that plaintiff proceeded on his own initiative, fully aware of the possible consequences.

Plaintiff argues that, being a lawyer, he knew that an oral contract was taken out of the statute of frauds by part performance, so that in effect he was induced to make the improvements. This argument misconceives the nature of the part-performance doctrine. It definitely is not an alternative method for the deliberate creation of a binding contract to convey land. A party aware that his claim is unenforceable should take steps to comply with the statute rather than make improvements and later complain that the application of the statute will work a fraud on him. To rule otherwise would be to invite the unfortunate situations which these cases of part performance always represent. By this we do not mean to say that an attorney, such as plaintiff, may never have

a case where part performance will take an oral contract out of the statute of frauds; but where, as here, there is nothing about the actions of the parties which unequivocally refers to a contract between them, the claim by an attorney that the statute of frauds is being used to work a fraud against him will be carefully scrutinized.

Plaintiff had a legal remedy for the recovery of his expenditures. Holste v. Baker, 223 Minn. 321, 26 N. W. (2d) 473. Plaintiff argues in his brief in support of his position that the statute of limitations has now run against any action he might have to recover the value of improvements made during 1943, 1944, and 1945. By bringing this action for specific performance, he assumed that risk unless he has otherwise protected his claim for improvements. In that respect, it would seem that the use of the land has compensated plaintiff at least in part for his expenditures. See, Jorgenson v. Jorgenson, 81 Minn. 428, 84 N. W. 221.

Since the facts and circumstances of this case fail to bring it under either of the theories upon which the doctrine of part performance is based, the statute of frauds must be given effect.

Reversed with instructions to enter judgment for the defendants.